No. 23,245.

E. C. MOURNING, *Appellee,* v. THE KANSAS CITY RAILWAYS COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

COLLISION—*Motor Truck and Street Car—No Recovery Under Doctrine of "Last Clear Chance."* The proceedings in an action for damages resulting from collision of a motor truck with a street car, examined, and *held,* the truck driver was not entitled to recover under the doctrine of last clear chance.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER, judge. Opinion filed February 11, 1922. Reversed.

*E. S. McAnany, M. L. Alden, T. M. Van Cleave, O. L. Miller,* and *C. C. Glandon,* all of Kansas City, for the appellant.

*David F. Carson,* and *James T. Cochran,* both of Kansas City, for the appellee.

27—110 KAN.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages resulting from collision of plaintiff's motor truck with one of the defendant's street cars. The plaintiff recovered, and the defendant appeals.

The accident occurred at the crossing of Parallel avenue, in Kansas City, and the defendant's standard-gauge, double-track railway. The plaintiff approached the crossing from the east, and the car approached from the north, on a down grade, and on the west track. The plaintiff's truck carried a load of furniture, which was not roped. When he was about to cross the tracks he applied his brakes and reduced speed, in order to go very slowly and not shake off the furniture. The plaintiff was operating his truck from a cab, with openings in the sides. When within 30 or 40 feet of the east rail of the east track he looked for the last time toward the north for an approaching car. When he entered upon the east track the car was 70 feet north of the crossing. He was moving at the rate of three miles per hour, and was able to stop the truck almost instantly. If he had then looked, he could have seen the car, stopped the truck, and prevented the collision. The car was moving at the rate of 15 miles per hour, and the plaintiff was guilty of crass negligence in driving in front of it. The court instructed the jury with reference to last clear chance, and the jury returned the following special finding of fact:

"12. Could the motorman of defendant's car have stopped the same in time to prevent the injury to plaintiff, after he saw plaintiff in a position of danger, if he had exercised ordinary care and prudence? A. Yes."

A motion to set aside this finding was denied, a motion for judgment on special findings establishing the plaintiff's negligence was denied, and judgment was rendered on a general verdict in favor of the plaintiff.

The plaintiff's witness, Williams, was an experienced street-car motorman, and saw the accident from the front vestibule of the street car, where he was standing beside the motorman. Williams testified that the truck slackened speed right on the track, and that, as the truck was going on the east rail of the west track, the street car could not have been over 10 or 12 feet away. He testified the motorman used his air first, saw he was going to strike the truck,

and then reversed his car, but when he reversed it was too late. The witness testified further as follows:

"There are two methods of stopping a street car on emergency. One is to apply the air, and the other is to reverse the car. I have known first-class, good motormen using one system, and first-class, good motormen using the other system. There is a difference of opinion among operators which is the better method of suddenly stopping a car. Some claim one, and some claim the other. My judgment is that to reverse the car is the better way, if you don't use too much power. If you use too much power you will knock your automatic. On a 1200 type car you can reverse your car and give it about two points. If you give it more than two points you would knock your automatic and then you wouldn't have any power. You would just drift. It would be the same as if the power was off. If you should, through mistake, give it more points than you should, and the overhead would blow out, then your car would be practically helpless. All you would have to·depend upon is your generator. When you reverse a car it won't go over 10 or 12· feet before the wheels stop revolving frontwards and go to revolving backwards. A car of the 1200 type, going at the rate of 15 miles an hour, if you endeavor to stop it, by reversing it, it will go 15 or 20 feet before the reverse catches. The reverse catches quicker than the air, and in my judgment is the surest way to stop a car suddenly, but you are taking a chance, when you use the reverse method, of blowing out the overhead, then the car becoming absolutely helpless, if you use too much power. This motorman used both methods. A car of the 1200 type, going at the rate of 15 miles an hour, on the kind of a morning this was, with the tracks in the condition they were on this morning, can be stopped in about 40 feet. You have got to make an awful good stop to stop it in 40 feet under those circumstances by the application of the reverse method."

Evidently Williams did not notice the grade of the tracks.

The plaintiff's witness, Laird, had been a motorman for fourteen years, and was familiar with cars of the 1200 type. He testified that such a car, moving at a speed of 12 to 15 miles per hour, could be stopped with ordinary brakes in possibly 75 feet. He testified further as follows:

"Q. And your judgment is that a street car of the 1200 type, going at the rate of 12 to 15 miles an hour, granting that the brakes are in good shape, could be stopped in from 50 to 75 feet? A. Yes, sir.

"Q. That would be a good stop, wouldn't it, Mr. Laird? A. Yes, sir.

"Q. A pretty good stop? A. A pretty good stop."

The motorman in charge of the car at the time of the accident testified as follows:

"A street car of the 1200 type, going at the rate of 15 miles an hour, down grade, such as there was between Stewart and Parallel, with the tracks in the condition they were at that time, can be stopped in about 50 or 60 feet by re-

versing. The proper way to make a quick stop is to throw off your air and jerk the reverse. If you haven't got any air on, jerk your reverse."

There was evidence that when the truck went in front of the car the motorman turned pale, sounded the gong violently, and to some of the occupants of the car appeared to be frightened and confused. When the plaintiff saw the car it was only ten feet away. He then gave his engine gasoline and tried to get across, but the car struck the truck at or in front of the rear wheel.

The 12th finding of the jury ought to have been set aside. In the case of *Dyerson v. Railroad Co.*, 74 Kan. 528, 87 Pac. 680, the court said:

"There is a general agreement in the authorities that where an engineer actually sees a person in a position of danger, and then fails to do what he reasonably can to prevent an accident, the railroad company is responsible for the resulting injury, irrespective of the question of contributory negligence. A logical and sufficient reason for this holding is that such conduct on the part of the company's agent amounts to recklessness or wantonness, and is analogous to a willful and intentional wrong, and like a wrong of that character establishes a cause of action to which negligence of the injured party is no defense. . . .

"The test is, What wrongful conduct occasioning an injury was in operation at the very moment it occurred or became inevitable? If just before that climax only one party had the power to prevent the catastrophe, and he neglected to use it, the legal responsibility is his alone. If, however, each had such power, and each neglected to use it, then their negligence was concurrent, and neither can recover against the other." (pp. 534, 536.)

The motorman could assume the plaintiff knew the car was coming. Slowing down at the east track indicated an intention to stop the truck and wait for the car to pass. The plaintiff was not in a position of danger when the front of the truck came to the east rail of the east track, or when the front of the truck came to the west rail of the east track. He could still use a portion of the space between the tracks without being struck. Reasonable care on the part of the motorman did not require him to take extreme measures to prevent his car from reaching the path of the truck, until it became evident the truck could not or would not stop, but would inevitably go in front of the car. The car was traveling 22 feet per second, and five times as fast as the truck. While the front of the truck went upon and crossed the rails of the east track, the car necessarily came within approximately 45 feet of the path of the truck. The plaintiff was not then helpless. He testified he could make a sudden stop, and had he been vigilant he could have kept

his truck from going far enough on the space between the tracks to cause the collision. Accepting the testimony most favorable to the plaintiff, the motorman did not have a "clear chance" to avoid the accident. There was only a possibility he might do so. If he acted with infallible judgment in respect to a matter about which experts differ, and performed instantaneously acts requiring time to perform, he might succeed in making "an awful good stop" in 40 feet. He did do what motormen regard as good practice. He applied the air. Finding the brakes would not hold the car, he released the air and reversed, but it was too late. The result is, just before the climax the plaintiff had it in his power to prevent the collision. It is possible the motorman may have been able to do so. The plaintiff did nothing but drive on. The motorman took fair measures of precaution. Recklessness may be attributed to the plaintiff, but not to the mortorman.

The judgment of the district court is reversed, and the cause is remanded with direction to set aside the 12th finding of fact and render judgment for the defendant on the remaining findings of fact.